CA NO. 16-50061

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DC# CR 12-722-TJH |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DARYLE LAMONT SELLERS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

———————————

**APPELLANT'S REPLY BRIEF**

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

HONORABLE TERRY J. HATTER
Senior United States District Judge


CARLTON F. GUNN
Attorney at Law
234 East Colorado Blvd.
Pasadena, California 91101
Telephone (626) 844-7660

Attorney for Defendant-Appellant

## **TABLE OF CONTENTS**

**Page**

I.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    THERE WAS OUTRAGEOUS GOVERNMENT MISCONDUCT REQUIRING DISMISSAL OF THE INDICTMENT.. . . . . . . . . . . 1

            1.    The Outrageous Government Misconduct Case Law.. . . . . . . . 1

            2.    The Court's Opinion in *Black*.. . . . . . . . . . . . . . . . . . . . . . . 3

            3.    The Present Case Compared to *Black* and the *Black* Factors Applied.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                  a.    The absence of reasonable suspicion and the casting of a wide net.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                  b.    The targeted men's supposed propensity, capability, and enthusiasm.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                  c.    The agent's encouragement of the crime and role in planning.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                  d.    Variation from the ATF manual.. . . . . . . . . . . . . . . . . 12

    B.    THE DEFENSE MADE A SUFFICIENT SHOWING TO JUSTIFY FURTHER SELECTIVE ENFORCEMENT DISCOVERY.. . . . . . . 15

    C.    THE COURT SHOULD CONSIDER MR. SELLERS'S PRO SE SENTENCING ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.    CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i

# <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Anders v. California*,
386 U.S. 738 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Beck v. City of Upland*,
527 F.3d 853 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Brown v. Allen*,
344 U.S. 443 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Chism v. Washington*,
661 F.3d 380 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Drummond ex rel. Drummond v. City of Anaheim*,
343 F.3d 1052 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Greene v. United States*,
454 F.2d 783 (9th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kaass Law v. Wells Fargo Bank, N.A.*,
799 F.3d 1290 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lacey v. Maricopa County*,
693 F.3d 896 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*McCoy v. Court of Appeals*,
486 U.S. 429 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Thompson v. Keohane*,
516 U.S. 99 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Townsend v. Sain*,
372 U.S. 293 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States v. Armstrong*,
517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*United States v. Bass*,
536 U.S. 862 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Batres-Santolino*,
521 F. Supp. 744 (N.D. Cal. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . 2

# TABLE OF AUTHORITIES (cont'd)

Page

## CASES (cont'd)

*United States v. Black*,
733 F.3d 294 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Black*,
750 F.3d 1053 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Bogart*,
783 F.2d 1428 (9th Cir.),
*vacated in part on other grounds sub nom. United States v. Wingender*,
790 F.2d 802 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*United States v. Briggs*,
623 F.3d 724 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Davis*,
793 F.3d 712 (7th Cir. 2015) (en banc). . . . . . . . . . . . . . . . . . 15, 16, 17, 19

*United States v. Goodwin*,
57 F.3d 815 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Guzman-Padilla*,
573 F.3d 865 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Hare*,
820 F.3d 93 (4th Cir.),
*cert. denied*, 137 S. Ct. 224 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*United States v. Pallares-Galan*,
359 F.3d 1088 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Pedrin*,
797 F.3d 792 (9th Cir. 2015),
*cert. denied*, 136 S. Ct. 2401 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Richey*,
632 F.3d 559 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Turner*,
104 F.3d 1180 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Wahid*,
614 F.3d 1009 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Page**

**CASES (cont'd)**

*United States v. Washington,*
 869 F.3d 193 (3d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19

*United States v. Williams,*
 846 F.3d 303 (9th Cir.),
 *cert. denied*, 137 S. Ct. 2145 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Yick Wo v. Hopkins,*
 118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

**STATUTES AND RULES**

Ninth Circuit Rule 4-1(c)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CA NO. 16-50061

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DC# CR 12-722-TJH |
| Plaintiff-Appellee, | ) | |
| v. | ) | |
| DARYLE LAMONT SELLERS, | ) | |
| Defendant-Appellant. | ) | |

I.

ARGUMENT

A.    THERE WAS OUTRAGEOUS GOVERNMENT MISCONDUCT REQUIRING DISMISSAL OF THE INDICTMENT.

1.    The Outrageous Government Misconduct Case Law.

The government is correct that there are only a few cases finding outrageous government misconduct. Hopefully, it is rare that federal agents engage in such conduct. Or it may be the government resolves the case in an agreeable manner when they do.

The government ignores the case that is most similar to the present case, however. That case is *United States v. Batres-Santolino*, 521 F. Supp. 744, 749

1

(N.D. Cal. 1981), cited in Appellant's Opening Brief, at 26 n.10. While *Batres-Santolino* is not a court of appeals opinion, it was cited with approval in *United States v. Bogart*, 783 F.2d 1428 (9th Cir.), *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986). *See Bogart*, 783 F.2d at 1437. *Batres-Santolino* comes much closer to the present case than the case of *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), which the government does discuss. What the court relied upon in *Batres-Santolino* was the "vast profit" the informant was proposing and the fact the targeted men there had never before imported cocaine, *Batres-Santolino*, 521 F. Supp. at 749, 751, which is similar to the undercover agent's statement here that the kilos and kilos of 100% pure cocaine could "change everybody's life," ER 101, and the fact none of the targeted men here had previously committed stash house robberies or engaged in distribution of large quantities of cocaine, ER 98-99, 117, 120. There was also nothing in *Batres-Santolino* like the "veiled threat" in *Greene* referring to "the boss," *id.*, 454 F.2d at 787; *compare Batres-Santolino*, 521 F. Supp. at 749 (noting reference to "big man," but that reference was intended merely "to encourage defendants to set a definite date in the near future for their return to [Ecuador] to make arrangements for a cocaine sale"), or aid in providing necessary materials like in *Greene*, *see id.*, 454 F.2d at 786; *compare Batres-Santolino*, 521 F. Supp. at 745-50 (description of facts with no indication government supplied materials).

Batres-Santolino arguably differs from the present case in that there was no realistic chance the defendants there could have consummated the drug transaction on their own, *see id.* at 751. The same could be said to some extent in the present case, however, for while Mr. Sellers and his codefendants were able to get guns and "tools" other than bulletproof vests on their own, they had no stash house to

2

rob without the undercover agent's help.

2.    The Court's Opinion in *Black*.

The government's discussion of *United States v. Black*, 733 F.3d 294 (9th Cir. 2013), is misleading in several respects. To begin, the Court hardly "approved," Government's Answering Brief, at 40, of stash house robbery stings in *Black*. To the contrary, it noted "troubling aspects about this fictional sting and how it came about in the first place." *Id.* at 302. The first troubling aspect was:

> [T]he fiction itself. The crimes . . . resulted from an operation created and staged by ATF. . . . [The undercover agent] invented the scenario, including the need for weapons and for a crew, and the amount of cocaine involved. The only overt actions by the defendants involved showing up at meetings, including arriving at the parking lot with four hidden, loaded weapons and then driving to the storage warehouse where they were arrested. Although those actions clearly corroborate the defendants' intent to carry out an armed robbery, defendants were responding to the government's script.

*Id.* at 302-03. This then "le[d] to [a] second major concern." *Id.* at 303.

> ATF found Simpson [one of the defendants] by "trolling for targets." (Citation omitted.) The CI provocatively cast his bait in places defined only by economic and social conditions: "a bad part of town, a bad bar, you know . . . bars where you've got . . . a lot of criminal activity." The risk inherent in targeting such a generalized population is that the government could create a criminal enterprise that would not have come into being but for the temptation of a big payday, a work of fiction spun out by government agents to persons vulnerable to such a ploy who would not otherwise have thought of doing such a robbery. *See Bogart*, 783 F.2d at 1436 ("Criminal sanction is not justified when the state manufactures crimes that would otherwise not occur. Punishing a defendant who commits a crime under such circumstances is not needed to deter misconduct; absent the government's involvement, no crime would have been committed.").

*Black*, 733 F.3d at 303. The Court then quoted *United States v. Briggs*, 623 F.3d

724, 729-30 (9th Cir. 2010) (citation omitted), as set forth in Appellant's Opening Brief, at 19, and concluded "the initiation of this sting warrants close scrutiny, and places a burden on the government to show that our concerns are not borne out in this case." *Black*, 733 F.3d at 303. The Court then reiterated these concerns after deciding the government had carried its burden in that case, cautioning that "we must remain vigilant that the government does more than set the 'bait' and create convictions by outrageous means." *Id.* at 310.

At least three judges believed there should have been dismissal even in *Black*, moreover. Judge Noonan was on the panel and dissented from the majority opinion, writing:

> "Lead us not into temptation" is part of a prayer familiar to many. But few, I believe, would think of this prayer as addressed to the government of the United States or would think it necessary to address the government with such a request. The present case creates a precedent and sets a framework in which such a prayer addressed to the government becomes comprehensible and probable.

*Black*, 733 F.3d at 313 (Noonan, J., dissenting). And Judge Reinhardt, dissenting from the denial of rehearing en banc, and joined by then Chief Judge Kozinski, described what the government had done as "a profoundly disturbing use of government power that directly imperils some of our most fundamental constitutional values." *United States v. Black*, 750 F.3d 1053, 1054 (9th Cir. 2014) (Reinhardt, J., dissenting from the denial of rehearing en banc).

The government's description of what it seems to suggest are more mitigating facts in *Black* also contains errors. First, it is not correct that the agent in *Black* told the defendants there to get guns, *see* Government's Answering Brief, at 46; rather, the defendants asked the agent for guns, he said he could not get them, one of the defendants subsequently said he could get "burners," and the

4

defendants in fact had their own guns on the day they were arrested, *see Black*, 733 F.3d at 300. Second, it is not correct that the defendants in *Black* "only grudgingly" agreed to "expand the crew," Government's Answering Brief, at 46; while they initially expressed confidence that just two men would be enough, they eventually said they would bring one other man on, and ultimately added three others, with no particular urging by the agent, *see Black*, 733 F.3d at 300-01. Third, it is not correct to say that "the crew then failed to show up to the next meeting," Government's Answering Brief, at 46; it is just that they were 25 minutes late, *see Black*, 733 F.3d at 301,[1] which is less late than the targeted men here were, *see* GER 429 (agent telling Mr. Hayes to be there at 7:00); GER 286 (testimony that Mr. Hayes and Mr. Thomas arrived at 7:30 and Mr. Sellers arrived at 7:38).

Finally, the government's bullet list of "principles" it describes *Black* as having "announced" is misleading, for they are either inapplicable, qualified in ways the government ignores, and/or simply make the government conduct slightly less indefensible.

- The statement that "[t]he government need not have individualized suspicion of the defendant's wrongdoing before conducting an undercover investigation," Government's Answering Brief, at 47 (quoting *Black*, 733 F.3d at 304), was immediately followed by a caution that such individualized suspicion "is an important consideration, however," *id.*

- The statement that government invention of the crime and targeting of

---

[1] One of the initial defendants in *Black* did drop out, but that defendant was not one of the appellants in the appeal, apparently because he had pled guilty and cooperated, *see Black*, 733 F.3d at 297 (listing appellants); Criminal Minutes, *United States v. Cordae Black*, No. 2:09-cr-1040-GMS (D. Ariz. April 28, 2010), ECF No. 240 (minutes reflecting Shavor Simpson called as government witness), so his different circumstances were not considered.

defendants knowing nothing about such crimes can be counterbalanced by defendants' enthusiasm, representations they had committed stash house robberies in the past, and independent role in planning the crime, Government's Answering Brief, at 47, ignores the fact that Mr. Sellers was not unqualifiedly enthusiastic; that none of the targeted men here claimed they had committed these types of robberies in the past, let alone, like one of the defendants in *Black*, claimed they had it "down to a science," *id.*, 733 F.3d at 300; and that the men were more partners in planning with the agent than independent planners, *see* Appellant's Opening Brief, at 21, 23-24, 27-29; *infra* pp. 10-11.

- The statement that the government may "reasonably rel[y] on the defendants' own credible representations that they had committed these robberies in the past," Government's Answering Brief, at 47 (quoting *Black*, 733 F.3d at 307 & n.10), ignores the fact noted in the previous bullet point that none of the men here claimed to have committed these types of robberies in the past.

- The statement that "mere [government] encouragement [is] of lesser concern than pressure or coercion," Government's Answering Brief, at 47 (quoting *Black*, 733 F.3d at 308), ignores the word "lesser"; that conduct is of "lesser" concern does not mean it is of no concern.

- The statement that defendants recruited by other defendants can hardly complain of government inducement, Government's Answering Brief, at 47 (quoting *Black*, 733 F.3d at 307), ignores the fact that Mr. Sellers was still uncommitted when he first met with the agents, noting, inter alia, that he remained "a little skeptical" and he and the agent were "just gettin' to know one another," GER 419.

- The recognition that stash house robberies are largely unreported crimes and sting operations are a safe way to address those crimes, Government's Answering Brief, at 47, was, like the statement that individualized suspicion is not required, followed by a caveat:

    That said, the risks we have identified in such a government-created fictional operation are not to be taken lightly. The government does not have free license to forgo reasonable alternative investigative techniques of identifying and targeting potential suspects before approaching them.

    *Black*, 733 F.3d at 309-10.

- Finally, as to the recording of the sting operation, *see* Government's Answering Brief, at 47, *Black* did not so much characterize the existence of recordings as mitigating as suggest that their content are what made the government able – *in that case* – to carry its burden. *See id.*, 733 F.3d at 310 ("We emphasize that in this case, the existence of tape and video recordings to prove what was actually said and done is weighed heavily in our review of the record. We

6

would be faced with a much different case if all we had to rely on was the credibility of the conflicting after-the-fact testimony of the government and defense witnesses.").

3.    The Present Case Compared to *Black* and the *Black* Factors Applied.

The government goes on to misapply the *Black* factors and/or ignore important facts in applying them.  The government also ignores important differences between the present case and *Black* that make the government conduct here significantly more egregious.

a.    The absence of reasonable suspicion and the casting of a wide net.

The government concedes the first two *Black* factors weigh against it, acknowledging that "the first two *Black* factors have never been in dispute. Agents did not know any of the defendants' criminal characteristics in advance, nor did they have individualized suspicion of their involvement in stash-house robberies."  Government's Answering Brief, at 49.  The already wide net cast in *Black* was even wider here, moreover.  The agents in *Black* targeted individuals who were both "willing" to commit a stash house robbery *and* "actually involved" in such robberies.  *See id.*, 733 F.3d at 299 (noting that CI's role was to "try and find some people that . . . are willing to commit a home invasion" and undercover agent "would then meet with interested individuals 'to determine whether or not they are actually involved in that type of crime'").  The agents here, as found by the district court, targeted anyone who was "willing," regardless of whether they

7

were already "actually involved" in such robberies. *See* ER 117 (finding that "the ATF was casting a wide net, and was interested in initiating a reverse-string [sic] operation involving anyone willing to perform an armed stash house robbery, whether or not the individual had been convicted or was suspected of having been involved in such robberies in the past").

This is an important difference. Targeting people who are willing *and* already involved in stash house robberies helps get actual stash house robbers off the street. Targeting people who are simply willing runs a grave risk of *creating* stash house robbers – especially when there are representations of hundreds of thousands of dollars of "one hundred percent pure" cocaine "right from across the fucking border," ER 100.

           b.      The targeted men's supposed propensity, capability, and enthusiasm.

The targeted men's supposed propensity, capability, and enthusiasm here fell well short of that of the defendants in *Black*. Most glaring is the difference in experience – and/or lack thereof – with stash house robberies. The first two defendants in *Black* spoke of their "goons" who "did this shit already," that they had "done this . . . a few times," and that they "got this shit down to a science." *Id.*, 733 F.3d at 300. The first two men here spoke of apparently ordinary robberies, one of which was a commonplace nonviolent note bank robbery. *See* Appellant's Opening Brief, at 5, 23. The men here did also show familiarity in dealing with cocaine, but the ability and willingness to traffic in cocaine is very different than the ability and willingness to commit an armed robbery to get the

cocaine.

The enthusiasm of the *Black* defendants was also markedly greater. After the undercover agent there "set his bait," the defendants "responded with enthusiasm" and "were eager to commit the fictional stash house robbery," *id.* at 307, and the opinion contains no suggestion of any subsequent hesitation or doubt. Here, in contrast, there was the suggestion at the July 9 meeting of just doing a fake robbery of the agent and Mr. Sellers wondering even at the last meeting whether there was "wiggle room."[2] There was also Mr. Sellers's statement at the first meeting he attended that he was "a little skeptical," which immediately *followed* the statement the government relies on, that "if [he] did not feel good about it, [he] wouldn't be here." GER 419. Mr. Sellers's multiple questions during this meeting also suggest he was far from irrevocably committed. *See* GER 404, 408, 409, 410, 412, 414, 415-16, 423-24, 425.[3]

---

[2] The government characterizes the latter as not hesitating about *whether* to do the robbery but wondering about *when* to do the robbery. First, this does not explain the prior suggestion of just doing a fake robbery of the agent, and, second, even a desire to delay is indicative of a lesser commitment.

[3] With respect to this and several of the other *Black* factors, the government suggests this Court can review the district court's evaluation of the factor only for clear error because the evaluations are "findings" that can be reversed only if they are "illogical, implausible, or without support in the record." Government's Answering Brief, at 52 (quoting *United States v. Richey*, 632 F.3d 559, 563 (9th Cir. 2011) (internal quotation marks omitted)). *See also* Government's Answering Brief, at 50, 55. This is incorrect because the *Black* factors are not findings of *fact*, but are mixed questions applying the law established by *Black* and its predecessors to facts such as what the defendants said and what the agent said. As the Supreme Court explained in another context in *Thompson v. Keohane*, 516 U.S. 99 (1995):

> [W]e have adhered to *Townsend*'s [*Townsend v. Sain*, 372 U.S. 293 (1963)] definition of the § 2254(d) term "factual issue."

9

c.    The agent's encouragement of the crime and role in planning.

It is not just the large amount of cocaine and 100% purity which constituted excessive government encouragement in the present case.  It was the glowing way in which it was described.  The agent "guarantee[d]" the cocaine was "100 percent pure" and described it as "fucking pure coke right from across the fucking border." ER 100.  He said it would "change everybody's life."  ER 101.  And he fine-tuned the danger so it was just right, making the guards armed so that the targeted men would need guns, but not so dangerous that the men would be scared off.  *See* Appellant's Opening Brief, at 24-25.

The agent also played a significant role in the planning of the crime and was relied upon by Mr. Sellers and his codefendants, which is again a striking contrast with *Black*.  One of the lead defendants in *Black*, in addition to boasting about his prior experience with stash house robberies, "proposed several robbery plans" at the first meeting.  *Id.*, 733 F.3d at 300.  When one of the subsequently added participants asked the undercover agent at a later meeting how the agent wanted

---

The *Townsend* Court explained that by "'issues of fact,'" it meant "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators . . . .'" 372 U.S. at 309, n.6 (quoting *Brown v. Allen*, 344 U.S. 443, 506, 97 L. Ed. 469, 73 S. Ct. 397 (1953) (opinion of Frankfurter, J.)).  "So-called mixed questions of fact and law, which require the application of the legal standard to the historical-fact determinations," the *Townsend* Court added, "are not facts in this sense."  372 U.S. at 309, n.6.

*Thompson*, 516 U.S. at 109-10 (footnotes omitted).  Findings which can be reviewed only for clear error are findings about things such as what exactly a defendant said.  *See, e.g.*, Government's Answering Brief, at 24 n.4 (correcting district court finding of words Mr. Sellers used on one of recordings).

10

the robbery done, the agent offered no advice at all, telling the defendant, "You tell me dude I mean this is your gig, I mean I do not even know about this shit." *Id.* at 301.

The agent here, in contrast, not only offered suggestions, but, in at least one instance, recommended an alternative to what one of the targeted men suggested. When Mr. Hayes suggested the undercover agent communicate with the men outside by texting as he walked into the house, the agent suggested leaving his phone on instead. *See* ER 105. The agent also rejected Mr. Hayes's suggestion that the men walk up to the front door with the agent. See ER 105.

The targeted men sought and welcomed such advice, moreover. Tellingly, one of the very first things one of the men did at the last meeting was ask the agent, "What do you think is the safest way of us going up in there?" GER 437. And the agent did not simply tell the men it was "their gig" and he "did not even know about this shit," like the agent in *Black*, but reminded the men of his prior suggestion and went on to brainstorm with them for another two pages of transcript about the best way for the men to enter the stash house.

The government's argument that the undercover agent "did not *lead* the discussions," Government's Answering Brief, at 58 (emphasis added), sets a higher bar than *Black*. The inquiry described in *Black* is "whether the government acted as a partner in the criminal activity, or more as an observer of the defendant's criminal conduct." *Id.*, 733 F.3d at 308. The undercover agent most certainly acted as a *partner* here.[4]

---

[4] It is true the agent did not provide the guns, ski masks, or zip ties, *see* Government's Answering Brief, at 58, but he did provide the "off paper" rental car, and he offered to look for bulletproof vests, *see* Appellant's Opening Brief, at

11

d.    Variation from the ATF manual.

The government's suggestion that the ATF manual is legally irrelevant because of the cases which hold government failure to comply with internal agency policy is not enough to establish a violation of constitutional rights, *see, e.g., United States v. Goodwin*, 57 F.3d 815, 818 (9th Cir. 1995), *quoted in* Government's Answering Brief, at 61, misapprehends the nature of the defense's reliance on the ATF manual.  The defense is not suggesting it can enforce ATF standards for stash house robbery investigations.  It is arguing those standards provide guidance about what is reasonable.  That an agency manual can be used for this purpose is established by cases like the case of *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003), which is cited in Appellant's Opening Brief.  *See also Goodwin*, 57 F.3d at 818 (stating that failure to comply with internal department policy does not establish deprivation of constitutional rights "without more").  The use of the manual for this purpose – consideration in setting a standard of reasonableness – also makes it irrelevant that the manual was created – at least in written form – after the investigation in this case.  As the district court incisively observed, "it is likely that the ATF's practices respecting fictitious stash house robberies post-2013 are similar to its practices pre-2013."  ER 94.

The government's claim that the defense is factually wrong because "all aspects" and "every stage" of the investigation were approved by the agents' supervisors and ATF headquarters, Government's Answering Brief, at 62, is itself

5.

12

wrong. The cited testimony – at GER 305-10 – contains just one exchange about approval by supervisors. And it was not approval of "all aspects" or "every stage" of the investigation. It was approval of the undercover agent's participation. The testimony was:

> Q     And, um, were higher-ups involved in this case and knew that Special Agent Carr was participating?
> A     Yes. Our chain of command was notified during this investigation.
> Q     And it was approved?
> A     We did get approval from Special Operations Division, Washington D.C.

GER 309.

The government is also incorrect in claiming the investigation here satisfied the requirements of the manual. That the statements the first two men made at the first meeting and the later confirmation of those statements[5] arguably satisfied the target criteria is not sufficient, because it is what the government knows before contact with the defendants, not what it learns after the fact, that matters. *See United States v. Pedrin*, 797 F.3d 792, 797 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2401 (2016). Even more important, the script in this case fell short of what the manual requires. What the manual requires, presumably to assure that only already active and serious stash house robbers are ensnared, is:

> [A]n armed robbery of a Mexican drug cartel's stash house for a large amount of narcotics.
> a.     Narcotics located in a house or garage, and is more difficult to obtain.
> b.     Stash houses guarded by two armed guards described by the undercover as extremely violent men.
> c.     Owners of the narcotics are members of a Mexican drug

---

[5] The later investigation actually only partially confirmed the men's statements. Mr. Thomas had claimed his "first case" was a robbery, but all ATF confirmed were prior state felony convictions for narcotics and "firearms-related offenses." ER 103.

> cartel, which is known to be an organized, violent group.
>
> d.     Defendants must have the ability to sell the narcotics after they steal it. Hence, they must be willing to commit yet another crime.

ER 555. But what the agent described was not owners who were part of an organized, violent group and guards who were "extremely violent men," but guards who were "relaxed" middle-aged or older men who did not even keep the door locked and had the cocaine just laying out on the floor. *See* ER 425-26.

    In summary, the investigation and other facts here went well beyond *Black* and beyond what ATF policy itself suggested – in multiple ways – and was significantly more egregious. First, the investigation targeted anyone willing to commit a stash house robbery, not just those who were willing and already involved in such robberies. Second, the defendants in *Black* were actually already involved in stash house robberies – "to a science," in one defendant's words – where the men here were not. Third, the undercover agent here was an equal partner in the planning where the undercover agent in *Black* told the one defendant who asked for advice, "it's your gig." Fourth, the undercover agent here made the fictional stash house not one that only the most hardened stash house robbers would risk robbing, but, like the baby bear's porridge in Goldilocks, "just right" – with guards who were armed, but also middle-aged, relaxed, and in a house without bars and windows that would not present too difficult a target.

    There may not have been outrageous government misconduct in *Black*, but there was outrageous government misconduct here.

14

B.   THE DEFENSE MADE A SUFFICIENT SHOWING TO JUSTIFY FURTHER SELECTIVE ENFORCEMENT DISCOVERY.

The government's argument that selective enforcement discovery may be ordered only if the defense produces hard evidence of non-minority similarly situated potential targets has now been rejected by at least three circuits.[6]  First, the Seventh Circuit, sitting en banc in *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc), rejected this argument, on the ground that the higher discovery threshold set for discovery of prosecutorial decisionmaking is justified by a "powerful privilege" and "a presumption of constitutional behavior" that does not attach to law enforcement conduct.  *Id.* at 720.  *See also* Appellant's Opening Brief, at 38 (quoting *Davis* more fully).  Second, the Fourth Circuit approved *Davis*'s reasoning as "cogent analysis" and an argument that is "well taken," in *United States v. Hare*, 820 F.3d 93 (4th Cir.), *cert. denied*, 137 S. Ct. 224 (2016).  *See id.* at 101.  The government's citation of *Hare* as holding that the standard for proving selective prosecution is the same as the standard for proving selective

---

[6]  The defense here did produce what might be labeled "soft" evidence of non-minority similarly situated potential targets, by showing that the targeted group included, in the district court's words, "anyone willing to perform an armed stash house robbery, whether or not the individual had been convicted or was suspected of having been involved in such robberies in the past." ER 117.  One must assume this group includes some non-minority individuals, for assuming only minority individuals are willing to commit such a crime would be engaging in the worst type of racial stereotyping.  The government's claim that this "anyone willing" standard was specific to this investigation, *see* Government's Answering Brief, at 66-67, is belied by the agent's testimony at the evidentiary hearing that he was following a standard "script" and using standards he used in all of his investigations, *see, e.g.*, ER 195, 257, 300-01, 302.

15

enforcement, *see* Government's Answering Brief, at 73, ignores the distinction between the ultimate finding of selective prosecution or enforcement and a preliminary order of discovery so the possibility may be investigated. *Hare* recognized the question of whether the standards are the same at the *discovery* stage is a different question. *See id.*, 820 F.3d at 99 ("We have not, however, specifically addressed whether *Armstrong*'s [*United States v. Armstrong*, 517 U.S. 456 (1996)] standard for discovery applies in the selective enforcement context."). *Hare* did find there was insufficient evidence to justify discovery in the particular case before it, but that was because the evidence "indicate[d] that ATF followed its protocol." *Id.*, 820 F.3d at 101. Here, the evidence indicated ATF did not follow its protocol, as discussed *supra* pp. 13-14.

Most recently, the Third Circuit has followed the Seventh Circuit – in *United States v. Washington*, 869 F.3d 193 (3d Cir. 2017). It – like the Fourth Circuit in *Hare* – recognized that "[s]*ubstantive* claims of selective prosecution and selective enforcement are generally evaluated under the same two-part test." *Washington*, 869 F.3d at 214 (emphasis in original). It then followed *Davis* in holding the standards for ordering discovery are *not* the same. It first noted, like the *Davis* court, that the considerations that led to the standard established in *Armstrong* do not apply to law enforcement agents. *See Washington*, 869 F.3d at 216, 219. It also noted a second concern pointed out by the defendant there, namely, "the difficulty of obtaining pre-discovery statistics in selective prosecution cases . . . when there are likely to be no records of similarly situated individuals who were not arrested or investigated." *Id.* at 216. It concluded that at the discovery stage, "the enforcement/prosecution distinction is a legitimate one." *Id.* at 220. It also held there did not need to be hard evidence of similarly situated

16

individuals of another race who were not arrested or investigated.

> The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions (as was the case in *Davis*) *even if* the underlying challenge is to law enforcement decisions. Distinct from what is required under *Armstrong*/*Bass* [*United States v. Bass*, 536 U.S. 862 (2002)], a defendant need not, at the initial stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

*Washington*, 869 F.3d at 221 (emphasis in original) (footnotes omitted).

The government is incorrect in suggesting there is contrary authority establishing a different rule in this circuit. The cases cited and discussed in the government's brief are inapposite. *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012), is inapposite because it was not a selective enforcement discovery case, but a civil rights case considering a grant of summary judgment on a substantive selective enforcement claim, which the Court held should have been allowed to proceed. *See id.* at 920-22. *United States v. Turner*, 104 F.3d 1180 (9th Cir. 1997), is inapposite because it was not a selective enforcement case but a selective *prosecution* case. *See id.* at 1181 (describing defendants as having "contended that they had been selected for *prosecution* on crack cocaine charges on racial grounds" (emphasis added.)); *id.* at 1182 (describing proffer that "no white defendants had been *charged* with crack offenses" (emphasis added)); *id.* at 1184 (addressing whether report "shows whether the [non-prosecuted] sellers were similarly situated to the sellers chosen for *prosecution* here" (emphasis added)).[7]

---

[7] The Supreme Court cases cited by the government – *Ah Sin v. Wittman*, 198 U.S. 500 (1905), and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) – are similarly inapposite, in addition to being cases decided more than a century ago before

17

The government's assertion that Mr. Sellers's attorney waived or forfeited reliance on *Davis* and the cases that have followed it, by his passing comment in the district court that he was "not quite sure" and did not "believe" there was a "meaningful" distinction between selective prosecution and selective enforcement, Government's Answering Brief, at 32-33 (quoting GER 90-91), also fails. To begin, "it is claims that are deemed waived or forfeited, not arguments." *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004). *See, e.g., United States v. Williams*, 846 F.3d 303, 311-12 (9th Cir.), *cert. denied*, 137 S. Ct. 2145 (2017); *Chism v. Washington*, 661 F.3d 380, 386 n.8 (9th Cir. 2011); *United States v. Wahid*, 614 F.3d 1009, 1016 (9th Cir. 2010); *United States v. Guzman-Padilla*, 573 F.3d 865, 877 n.1 (9th Cir. 2009). Secondly, even wholly separate issues may be raised for the first time on appeal when there has been a change in the law, *Kaass Law v. Wells Fargo Bank, N.A.*, 799 F.3d 1290, 1293 (9th Cir. 2015), which *Davis* and the cases following it may be fairly characterized as being. And this change in the law exception is especially appropriately applied where a new legal standard has arisen during an appeal, the standard has been brought to the court's attention by one of the parties, and the issue "was extensively litigated in the district court, albeit under a somewhat different legal framework." *Beck v. City of Upland*, 527 F.3d 853, 867 (9th Cir. 2008).

---

concepts of selective prosecution had been refined. *Ah Sin*, like *Turner*, was a selective *prosecution* case; though the Court used the word "enforced," it meant "enforced" in the form of criminal prosecution. *See id.*, 198 U.S. at 506 (discussing "discrimination in the administration of the law"). And *Yick Wo* is distinguishable because (1) the defendant there was granted relief, *see id.*, 118 U.S. at 374, and (2) the discrimination there was in the denial of permits which allowed the lawful operation of laundries, not the decision to investigate and/or prosecute subsequent operation without a permit, *see id.*

The fact Mr. Sellers was not the first man approached also does not matter. The defendant who appealed in *Washington* was also a later participant who was recruited by the first man with whom the government had contact. *See id.*, 869 F.3d at 198. In fact, even that first man initiated the contact in *Washington*, by approaching an informant about robbery opportunities. *See id.*, 869 F.3d at 198, 222. The *Washington* court – following *Davis*, where the facts had been similar – held this did not preclude selective prosecution discovery because "it remains possible that the [government] would not have pursued the investigation had [the crew] been white." *Washington*, 869 F.3d at 222 (quoting *Davis*, 793 F.3d at 723).

Finally, the fact the defense received the redacted ATF manual does not mean Mr. Sellers has already received everything to which he is entitled. The same argument was rejected by the Third Circuit in *Washington*. The defendant there had also received a redacted portion of an ATF manual, *see id.*, 869 F.3d at 222, which was probably the same material provided to the defense in the present case. The court held the district court nonetheless had discretion to grant additional discovery and remanded for the district court to decide whether and how to exercise that discretion. *See id.* at 222-23.

There should be a similar remand in the present case for the district court to similarly exercise its discretion under a correct legal standard – if the Court does not order dismissal based on outrageous government misconduct. The "measured steps" the court may take, *Washington*, 869 F.3d at 218 (quoting *Davis*, 793 F.3d at 722), are outlined in both *Washington* and *Davis*.

C.    THE COURT SHOULD CONSIDER MR. SELLERS'S PRO SE
SENTENCING ARGUMENT.

The government incorrectly states at the beginning of its brief that Mr.
Sellers's pro se supplemental brief was filed without counsel's assent.  In fact,
counsel not only assented, but affirmatively filed a motion to allow filing of the
supplemental brief – two separate times.  *See* Unopposed Renewed Motion for
Permission for Defendant-Appellant to File Pro Se Supplemental Brief, filed June
9, 2017, ECF No. 28; Unopposed Motion for Permission for Defendant-Appellant
to File Pro Se Supplemental Brief, filed May 5, 2017, ECF No. 22.  Further, the
motions were not opposed by the government – as indicated in the titles of the
motions, the motions themselves, and counsel's declarations in support of the
motions – so even the government assented.  In addition, the government used Mr.
Sellers's pro se brief as part of its justification for seeking to file an oversized
brief, which was subsequently allowed when the defense did not oppose it.  *See*
Government's Motion to File Oversized Answering Brief, at 3-4, filed October 16,
2017, ECF No. 41; Response to Government Motion to File Oversized Answering
Brief, filed October 24, 2017, ECF No. 42; Order, filed October 26, 2017, ECF
No. 43.

The Court's subsequent ruling – issued by the Court's Commissioner – was
to leave the matter in the discretion of the panel assigned to decide the merits of
the appeal.  *See* Order, filed June 12, 2017, ECF No. 29.  The appropriate way for
the assigned panel to exercise that discretion is to treat the briefs filed by counsel
as an Anders brief on sentencing, on which counsel has made no argument.  When
an Anders brief is filed, the defendant is given an opportunity to file a pro se brief,

the court considers that brief, and the court orders further briefing if it believes further briefing would be helpful. *See McCoy v. Court of Appeals*, 486 U.S. 429, 444 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967); Ninth Circuit Rule 4-1(c)(6). That is how the assigned panel should proceed here, though it need reach the question of sentence only if it rejects counsel's challenges to Mr. Sellers's convictions.

## II.

## CONCLUSION

Mr. Sellers's convictions should be vacated and the indictment dismissed. If the indictment is not dismissed, the matter should be remanded for the district court to consider whether and how to exercise its discretion to order selective prosecution discovery. If the convictions are allowed to stand, the Court should consider Mr. Sellers's pro se brief as it would a pro se brief filed in response to an Anders brief.

Respectfully submitted,

DATED: October 27, 2017          By   s/ Carlton F. Gunn
                                      CARLTON F. GUNN
                                      Attorney at Law

21

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this  brief is proportionally spaced, has a typeface of 14 points or more, and contains 6,327 words.


DATED:  October  27 , 2017                     s/ Carlton F. Gunn
                                               CARLTON F. GUNN
                                               Attorney at Law

# Certificate of Service

I hereby certify that on October 27, 2017, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Carlton F. Gunn
_____

By:    CARLTON F. GUNN
